Our next case for this morning is Erika Mandrell against Acting Commissioner Kilolo Kijakazi. So, Mr. Richter. Thank you, Your Honor, and may it please the Court. As it relates to is whether the Court is willing to conclude the complexity of psychological examination records may be unilaterally interpreted by an ALJ without the scrutiny of any doctor and deemed consistent with the ultimate residual functional capacity the ALJ assigns. Are you in any way, there's discussion in your brief that makes me think that you are also complaining about the hypotheticals insofar as they don't seem to reflect her difficulty working around men because of the PSTD and the like. And so I'd like to know to what extent you've preserved that argument in the record. That's correct, Your Honor. A significant issue for appellants is her ability to interact with others, to be around others. But particularly men, she testifies to given her experience. She is a sexual assault victim and one of the major symptoms that's documented here is hypervigilance and guarding in her therapy appointments. So this is the gun in the bed and that kind of thing? I'm sorry. The gun in, that she needs to sleep with a gun and she's, yeah. Those sorts of, yes. But there are also clinical observations by her treating clinicians and that they observe hypervigilance, they observe guarding while she's in a therapy appointment. And getting back to the issue of the ALJ assessing those sorts of symptoms on his own, the problem there is that he came to the conclusion that things like hypervigilance or guardedness were not consistent with the sort of, I think he used the word pervasive, anxiety that she alleged. In other words, disabling anxiety that she alleged. So is your theory then that if the ALJ had either sought out the correct experts or otherwise had assessed her condition correctly, the hypothetical itself would have looked different? The hypothetical would have included more limitations? Absolutely, Your Honor. And he did assess moderate limitations in the body of his decision. He assessed moderate limitations in maintaining attention, concentration, persistence, and pace. And the relationship between her trauma and that issue is that she was on guard. She was hypervigilant. She thought an attack or assault was imminent at most times, even sitting in a doctor's appointment. So looking at the hypothetical, one of them is a person who can understand, carry out, and remember simple instructions. Okay, that seems fine. Respond appropriately to supervisors and coworkers in the usual work situations. So that doesn't seem, if she can't even sit in a therapy appointment, how can she do that? Right. And the ALJ, I think he concluded that she could do that on an occasional basis, which is what Social Security defines as just over 2 hours of an 8-hour day. His conclusion was that she could do it appropriately for more than 2 hours, which is problematic in itself in that why could a person interact appropriately for 2 hours and 20 minutes but not 8 hours of an 8-hour work day? If she has the trauma, she has the trauma. And if she has the symptoms as a result of being then that's not just going to go away if she's only limited to being around those folks for just over 2 hours at a time. The other problem with the residual functional capacity there is that the ALJ concluded that she couldn't be around the general public at all. But there was a discrepancy in the limitations he assessed between the general public and coworkers and supervisors. Like I said, he found she could be around them for just over 2 hours and she could not interact with the general public at all. And so the problem with that is that it also is a medical judgment. There's no medical basis in the record to differentiate between the general public and colleagues and supervisors here. I mean, there's a distinction. There are jobs that vocational experts identify that kind of behind closed doors. They're behind the barrier between the public and the company. And so they can do their job and not interact with the general public. But I guess you're saying that we don't know why she can do one versus the other. Right. And there are almost any job that requires someone to interact with their supervisors. Right. And so the unspoken reason for the distinction there, I believe, is that one is disabling and one is not. The exposure to the general public, there are a significant number of jobs, as you alluded to, that people can perform. There aren't many jobs that people can perform without having to answer to a supervisor, accept criticism, take instruction. And so the distinction in his conclusion seems to be related to his ultimate conclusion of non-disability as opposed to some medical basis or even a logical basis for doing so. Now, I do want to address Appellee will certainly allude to the Pavlicek case. And I kind of just want to get out ahead of that in distinguishing the facts of this case from that, In that case, the ALJ was able to rely on state agency reviewing psychologists who concluded that the claimant there's ability to maintain concentration would be directly related to an ability to be around coworkers and supervisors on an occasional basis. Here, the state agency reviewing psychologists gave no functional limitations. They assessed severe mental impairments, but they deemed the record insufficient to give actual psychological limitations. And so that wasn't available for the ALJ to rely on here. And I see I'm up against my time here. If you'd like to save the rest of your time for rebuttal, that would be fine. Yes, thank you. Certainly. Ms. Schacht. Good morning. May it please the court. My name is Meredith Schacht and I represent the Commissioner of Social Security. The ALJ here was tasked with determining in his January 2019 decision whether Ms. Mandrell was disabled on or prior to March 31st, 2016. Right, and so we're just talking about a very short time for benefits, right, from October 1st to March 31st of that year. That's exactly right. I want to tell you right away, there are a couple of things about this case that are very troubling to me. And so I'll just put a couple on the table and you can respond. One is I don't think the ALJ ever captures in any hypothetical to the vocational expert her consistent testimony that being around men in all sorts of ways is a serious PTSD trigger for her, whether it's smelling old spice or whether it's just being in company with men. And there's never a hypothetical that says someone who can work only around women, perhaps because that would be a different problem. Maybe there are no such jobs given the state of the law. So that's one thing. Another thing is that the ALJ does seem to make some real leaps in the findings of fact. For example, because she enjoys martial arts training, she must have been around men. Well, there's no evidence for that, and it's actually not even right. The police offer classes that are exclusively for women to help them with self-defense. So there's a factual assumption with no basis. He draws a negative inference from the fact that she doesn't attend psychotherapy in complete ignorance of the fact that avoidance of psychotherapy is actually a symptom and maybe a consequence of severe PTSD. You know, if the ALJ had some evidence in the record to say, I reject that evidence, then okay, you know, you would certainly look at it. She, you know, it just doesn't seem that the hypotheticals that the VE gets are this woman. There's somebody else, and if somebody else can work, then that's fine. But the job was to decide whether she was eligible for these benefits for that period. I'll do my best to address all of those, Your Honor, and please remind me if I miss some of them. On the point of avoidance of psychotherapy, the ALJ didn't address that point because that's not something that Ms. Mandrell asserted. In fact, she specifically asserted that she did have counseling, that she obtained treatment, but there was no evidence in the record of it. And her counsel at hearing, her attorney, conceded that fact. He said, she'll testify she's been in therapy all this time, and I certainly believe that's true, but we just don't have that many notes. We don't have the records. So it's not a situation where the ALJ was asked to consider, this woman has said she was incapable of attending treatment, obtaining treatment. That would certainly be something. No, she's not. That's what I'm saying. She's not capable of. Well, that's what you're saying, Your Honor, but that's not what she said. She said that she did obtain treatment, but there's no evidence of it. She goes off and on. She goes off and on. Claimant reports having a panic attack, the psychology intern talks to her. She's off and on. She said that she had obtained counseling since 2016, but there's no record of that. None of those records were submitted to the agency. So if the agency thinks she hasn't had treatment, then what inference is it going to make? Well, the inference that the ALJ made here was that there's a disconnect between what Ms. Mandrell was saying to him during hearing and what the evidence showed. Now, Ms. Mandrell had the obligation to produce that evidence. That was her requirement and her obligation. Okay, so he says, in short, there has been no regular individual psychotherapy counseling despite Dr. Woolley's inference to the contrary. That looks like a finding to me and one that he's making in a negative way. Your Honor, he also says on page 21 of the record, page 7 of his decision, the clinical signs do not quite match the allegations of persistent and pervasive levels of anxiety, despite Claimant's remark that she's been in outpatient counseling in 2016, the social workers, and he goes through the evidence that shows that simply doesn't appear to be true. So what the ALJ then was faced with was somebody telling him something that was not substantiated by the record. It was her obligation to provide that evidence if it existed. The Supreme Court has acknowledged that that's a very reasonable placement of burden, that the plaintiff, the claimant, is the individual who has the information about that treatment, and so she is obligated to provide it. Well, I get that, but I guess maybe you and I just read this paragraph that's at the bottom of A10 and I'm carrying over differently because what the ALJ says is the claimant sees her psychiatrist on the average of two times a year, primarily for medical management. Such a course of treatment does not reflect or support a situation of persistent and pervasive disabling-type symptoms, and I guess I'm saying that sounds to me like an inference from not very much treatment to saying she's not really all that disabled, and that's precisely the inference that I don't see any support for. I don't see any expert support for that. You know, people with severe PTSD, there is literature that suggests they avoid that kind of treatment because it's too stressful for them. And that is certainly something that Ms. Mandrell or her counsel could have presented to the ALJ. But how are they supposed to know the ALJ is going to draw this inference? Well, because they discussed at hearing whether there was any record of that treatment that she asserted having. They discussed that treatment, asserted treatment, at hearing, as counsel said. Right, so she tries often not to have treatment. Anyway, okay, so your position is the ALJ has what he needs. Yes, my position is that the ALJ considered the evidence that was before him reasonably. But draws the inference from lack of treatment that she doesn't really need treatment. No, that's not the inference that he drew. He acknowledged that she obtained treatment throughout the period, but that that treatment consisted of two to three visits to her psychiatrist throughout the relevant period. No, he says does not reflect or support a situation of persistent and pervasive. So he's not saying she got treatment and that's what she needed. That's exactly what he's saying. The claimant sees her psychiatrist on the average of two times a year, primarily for medication management. Right, and such a course of treatment does not reflect or support a situation of persistent and pervasive disabling-type symptoms. And the regulations specifically require the ALJ to consider the course of treatment that a claimant obtained. It instructs that that's a relevant consideration for him to have. It does not indicate that it's a medical finding. Rather, that's a point that ALJs are specifically instructed by the regulations and by agency policy to consider. Now, do you seriously think this woman can work a week given her PTSD, given she can't even make it through a therapy session without crying and breaking down? Well, I would suggest that one's emotions during a therapy session are not the same as one's emotions in a workplace. And I would say that I do seriously think that the ALJ's decision was reasonable given the evidence that he had. She went to martial arts training. To your point, I think it was a step too far to say that the evidence showed that she never interacted with men or that she certainly didn't interact with men. Right, it's not evidence that she's interacting with men, and it's hard for me to imagine a workplace that would tolerate isolating you from men. And as discussed during the hearing, that was an accommodation. So that's not a... But he doesn't incorporate it in the hypothetical. The E is never asked, could you sustain full-time work if you had to be isolated from half of the world? Because he concluded, the ALJ concluded, that that was not necessary. Her psychiatrist was a male. She interacted with him. Counsel says that she would not have been able to interact with supervisors or bosses. In fact, Ms. Mandrell specifically reported to the agency that she did not have any difficulty with authority, or she said, I have no problem with authority figures, including bosses. But during questioning by the ALJ, she's asked, quote, what do you feel like would get you stressed out or nervous in a work situation? Her response is men. And then she's asked to elaborate, and she says, anything can bring it on, smells, time, types of smells, types of looks, glare, the old spice smell. You know, she does put this out. No doubt, Your Honor. She obviously experienced a very traumatic and horrible event. We certainly don't question that or the fact that she suffered as a result of it and she has limitations as a result of it. But the ALJ was tasked not with considering the sympathies, but considering what evidence was presented to him. It's certainly not the case that everybody who has experienced sexual assault is disabled. No, of course not. But you admit she has a diagnosis of PTSD. She does have a diagnosis, and there's plenty of other evidence that the ALJ considered about her activities, about observations. So she's hypervigilant. She has a diagnosis, but she also has calm demeanor. She's also cooperative. She also has normal speech and an ability to interact. So the ALJ adequately considered the evidence that was before him, as he was required to do. He had to weigh it. He did weigh it. He reached a reasonable decision. And so we would ask this court to affirm. Okay. Thank you. Anything further, Mr. Richter? Just very quickly, Your Honor. I would just say that the symptoms exhibited by Ms. Mandrell in her psychotherapy treatment, intermittent as it may be, and for good reason, the record indicates, crying spells, hypervigilance, guardedness, those were the sorts of symptoms that unquestionably she would exhibit in a work environment where she were exposed to men, as she made clear. And the validity of that testimony is something we believe should be looked at and addressed by a medical expert who we believe would agree. So we ask to remand. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.